# BALTIMORE CITY COURT.

Filed November 4, 1927.

---

IVY I. LEONARD AND THOMAS B. LEONARD, CO-PARTNERS, TRADING AS L. L. LEONARD AND COMPANY,

VS.

SWEPSON EARLE, CONSERVATION COMMISSIONER OF MARYLAND AND HEAD OF THE CONSERVATION DEPARTMENT OF THE STATE OF MARYLAND.

---

*V. Calvin Trice* and *William L. Rawls* for petitioners.

*Henry H. Johnson* and *Robert H. Archer* for respondents.

OWENS, J. (Orally)—

(The Court orally) I understand that some additional papers have to be filed to these pleadings, in other words, as the case stands, the ruling on the demurrer cannot properly be made. Now, I am prepared, if you gentlemen want me to do so, to decide the law question presented to me here today, but I will only do so with the understanding that this case when it goes to the Court of Appeals does not go in an unfinished form, and goes down to the Court of Appeals by amendment of the proceedings wherever necessary, or additions to them, in such a way as not to let the Court of Appeals think that I decided a case before it was at issue.

You gentlemen are going to take care of the pleadings?

(Mr. Archer) As I understand from Mr. Rawls—if I am not right, let him correct me—the difference is as to the percentage of oysters that come from out of the State.

(The Court) If I am to decide the question you people must fix these papers so that the question I decide is a matter of law, and if you cannot do it among yourselves I am not going to decide it at all.

(Mr. Archer) It is just with reference to those percentages. The only question of fact is as to those percentages of out of the State oysters. Those percentages on behalf of the State are based on actual figures which were turned in by the packers to the Conservation Department. We stand on those. I told Mr. Rawls that at his convenience he could examine the Department's records, and if we had made a mistake in figuring the percentage we would correct that in the answer. That is all I can agree to.

(The Court) I do not want this case taken down to the Court of Appeals on some question of pleading, and I look to counsel to prepare the pleadings in the case so that the law question alone is presented.

(Mr. Archer) The only thing that could be changed would be those percentages.

(The Court) Then you must provide me with some finding of fact or else eliminate it in some way.

(Mr. Rawls) That is right, we will do that, your Honor.

(The Court) Now, gentlemen, I studied this question last night and, of course, in one night it could hardly be expected that I would be able to get as sound a conclusion on the question as you competent and distinguished gentlemen who have presented it here to me did, but I did form an opinion, and I started out to write an opinion, but when I realized that if I were to try to do that, that in order to pay proper attention to the very serious questions involved, it might take me so much time with the many things I have to do here during the day, that I might delay my opinion for a longer period of time than a judge ought, with reference to the matter that affects very seriously the operation of the

State Government. And therefore I concluded to jot down some notes and then to attempt orally to give my reasons to you.

Of course, you gentlemen know that a man who has been living all his life in the City of Baltimore and going from one end of the State to the other in the discharge of his professional duties, and therefore meeting everybody who is anybody from one end of the State to the other, forms a very extended acquaintance and knows nearly everybody who in any way could come before you to practice law both in your city and your State, and it is one of the pleasures and one of the embarrassments of this office to which I have been elected that I have to decide questions between personal friends, so to speak, and yet the mere fact that I realize that I can still retain their personal friendship, no matter how I decide those questions and how sorry they may feel for me, gives me a certain amount of independence in the matter and allows me to render a decision without hesitation.

In thinking over this matter it occurred to me that when Columbus sailed on his voyage of discovery there was extant a map showing that west of the Azores was an enchanted territory terminated by the world's end at which the waters of the Atlantic poured into a bottomless pit. I have in my library a reproduction of this map showing the mountains of loadstone that would pull nails out of vessels, waters filled with marine monsters and the rushing waters pouring into this bottomless pit. It is a very striking and alarming picture. The credulous world at that time believed this to be true and feared to investigate or explore. Columbus did not, and he found it false. When we are confronted with a novel situation we are naturally inclined to be apprehensive.

There is no doubt that the Act under consideration is a novelty and an experiment in the field of legislation. My attention has not been called to any legislative precedent for this Act, except perhaps the slight reference made a few minutes ago to the laws of the State of Texas, which have not actually been called to my attention but which I assume are somewhat similar.

The fathers who framed the Constitution of this State and the fathers who framed the Constitution of the United States as well were apprehensive of the tendency of Government when vested with arbitrary powers to override or ignore the rights of the individual citizen. To absolutely insure the protection of the individual citizen you will find attached to the State Constitution our Declaration of Rights and the first ten amendments attached to the Constitution of the United States.

While, therefore, under the policy of our law the reserved rights of the individual must be protected, still we must not be frightened, in our effort to do this, into the other extreme of so tying up the administration of the State Government, which is to be administered for the benefit of all, that it be prevented from functioning in a situation of great moment.

In the Charter granted by King Charles to Lord Baltimore the inhabitants of Maryland were granted the common Right of Fishery, and by reason of our surpassing water facilities this common Right of Fishery is one of the most valuable heritages of our people. Throughout the years large fortunes have been made from its prosecution, but above and beyond all by reason of the courage and intelligence required of those whose vocation it has been and is, it has developed a type of citizenry from whose ranks men have sprung who have held high positions in State and Nation, who have helped to mold our institutions, and have been of those upon whom the people relied in critical periods of our history. They were tried and not found wanting.

It is natural, therefore, that the oyster industry, a part of this common Right of Fishery, should have been, as it has been the subject of continuous legislation. And the Act now under consideration is a part of what was done with reference thereto at the last session of the Legislature of Maryland. Now, what is the Act that the Legislature passed. They passed a law, Chapter 119, of the Acts of 1927, An Act to repeal and re-enact with amendments, Section 91, of Article 72, of the Code of Public General Laws of Maryland, title "Oysters," sub-title "Packing Oysters," and to add a new Section to Article 72, of the Code of Public General Laws of Maryland, title "Oysters," sub-title 'Packing Oysters," to be known as 91-A to follow immediately after Section 91 in said Article.

Then there is a preamble to that Act:

"Whereas, the demand for oysters is constantly increasing and the oyster bars and rocks of the Chesapeake Bay and its tributaries are showing such great depletion that constructive legislation is necessary to preserve and rehabilitate such depleted areas, and

Whereas, a Seafood Committee, consisting of representatives from each tidewater county was appointed by Governor Albert C. Ritchie, to investigate and recommend remedial legislation to increase the oyster supply of Maryland, among which was the recommendation that the State should reserve ten per cent. of all shells made by the oyster packing houses to be planted upon reserved and seed areas; therefore:

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That Section 91, of Article 72, of the Code of Public General Laws of Maryland, title 'Oysters' sub-title 'Packing Oysters,' providing for licensing of oyster packers be and is hereby repealed and re-enacted with amendments," and so forth.

The provisions of the bill in its entirety everyone of you here knows. The objection is made that this bill violates the provisions of the Constitution of the State of Maryland and the provisions of the Constitution of the United States. As a starting point the relators charge that the bill embraces two subjects, one subject providing for the issuing of licenses for the packing of oysters, and the other or second subject, a provision that the license to pack oysters shall be in the nature and form of a contract.

In looking at the Act I find by its very terms that that objection cannot be maintained, for the reason that the Act itself provides after the statement that those who desire to pack oysters shall take out a license, *such license* to be in the nature and form of a contract between the State of Maryland, the entire license to be in the nature and form of a contract between the State of Maryland and the applicant and shall provide for the payment of a license fee of twenty-five dollars, and then the other provision. Manifestly, therefore, this license was entire and must be taken out in a way that would include within the license the contract for 10 per cent. of shells as provided by by the law.

Now, when we come to that contract we are met by very cogent reasoning and very able argument, and, as I said at the outset, I was very apprehensive about the matter at first because I thought I saw some very great and grave inequalities that might be possible under the Act. But when I came to consider the Act I realized that those inequalities really could not be, that the words in the contract "at least 10 per cent. could not mean that it would ever be within the power of the State Conservation Department to *exact* more than that 10 per cent. At first I thought it could. But I was certain after examining the Act critically last night that that could not be the case. Then I thought there were grave inequalities that might be practiced by the Conservation Department on people differently located. But I realized that that was a matter of the administration of the law, and if the State Department did do anything that was unjust the Courts would immediately stop that irregular and improper and one-sided attempt to operate under the law. Then I came to the consideration of what is the necessity, the real reason for this Act, and I came back to my own knowledge of the subject matter. I realized after considering the matter that when this Act was passed imposing upon the packer this contribution of not less than 10 per cent. of his shells that the reason of it consisted in the fact that the packer is the certain reservoir of the shells needed by the State and that the only way to get shells in quantity sufficient for the purpose of the reconstruction and rehabilitation and renewal of this priceless heritage of our people was by getting the shells from that source. There was no other way in the world that we could within the limits of the State of Maryland get shells in sufficient quantity for this very urgent and necessary situation except at prohibitive prices and therein I find the reason of the law. I find that the purpose and object of the Act did have a direct relation to the subject matter, which is the beginning point of all sound legislation, as I understand it.

Now, I am confronted by the argument, "You cannot do this, you cannot take these shells of our willy-nilly

away from us. That is a wrong thing, because you are confiscating private property for a public use and you have no right to take private property for a public use without just compensation." Well, I do see some just compensation. I say that no man has a right to conduct the business of an oyster packer or to continue to conduct the business of an oyster packer in the State of Maryland unless he complies with the law under which he is licensed, and does what the law says he shall do, and the law says unless you are willing to give the State 10 per cent. of your shells or pay their equivalent in money, if the State does not need them for this great reclamation purpose which they propose to carry on, you cannot have a license, to conduct business. And a man comes along and says, yes, I am perfectly willing to do that, and he signs an agreement and he gets his license, and as a consideration therefore he is permitted to conduct the business of an oyster packer within this State.

Now, in my opinion, he gets under the theory of the law just compensation, or at least he accepts it because he goes on with his business.

Now, I am again met with the argument that these oyster shells do not belong to us or do not belong to the State because a portion of these oyster shells come from other States of the Union, and that therefore when we confiscate, so to speak, using the language of the relator here, when we confiscate these shells we are taking shells that never were a part of that common heritage to which I have referred. But you must remember, gentlemen, that at the time of appropriating these shells to the rehabilitation of the oyster territory they are no longer the shells of the people in the State from which they came, but they are within the limits of the State of Maryland and are part of the personal property of the gentlemen who are conducting this business within the State of Maryland under a license from the State and the shells are to be used for the welfare primarily of the people who take the oysters and secondly for the benefit of the relators.

I do not think it is necessary to go into any extensive discussion as to whether or not it is an occupation tax or what it is. I do not think it makes any difference really what you call it. I think under the peculiar circum-

stances of this case and the conditions surrounding the industry that the provisions of the Act are in no sense unreasonable. They are in no sense unjust and I think if in the course of the operation of the law, as I said before, any great injustice is done to any person engaged in the business the Courts of this State stand ready to fully protect them.

I have not gone into all the questions. I mean I have not undertaken to pass upon all the questions referred to in your discussion of the case, but holding these views, and finding no positive provision of either the State or Federal Constitutions that may be said in any manner to be violated by this Act. I will overrule the demurrer filed by the relators in this case and when the papers are properly fixed up I will then dismiss your bill so you c a n take an appeal. I want you to understand that I have passed upon this case as a mandamus proceeding because I would not think for a single moment that distinguished counsel like yourselves have not already determined that this is a proper case for mandamus.

(Mr. Rawls) Well, I think that is uncontested, as a matter of fact.

(The Court) I understand, but yet at the same time I have treated it as a mandamus case because you gentlemen treated it as a mandamus case.

(Mr. Rawls) Your Honor, just one word about the record. I think there are only two matters that I am concerned with, that they are the portion of the oysters from out of the State—it is conceded in Somerset County that is 16½ per cent. I would like to go over the figures of the Conservation Commissioner and if I find that they are in accord with my information I will accept those figures. If on the contrary, they are not in accordance with my information and I cannot get any agreement with my brother as to what the percentage may be, it is conceivable that I would want to take a little testimony just on that point. I would also want to get the facts regarding the leased beds in the record. I cannot imagine that there would be any difference between my brother and myself, and we should be able to stipulate on that. I have got the information.

(The Court) I think there cannot be any mistake as to those figures, and I think you can amend your petition and answer or whatever is necessary by putting those figures in those papers.

(Mr. Rawls) I should think so.

(The Court) And that would bring up the question of law which I understood I was to decide and which I have decided and I am sorry I could not decide it both ways.

(Mr. Rawls) If your Honor will leave the matter open——

(The Court) You gentlemen can fix the papers up, yes.